Move to Appeal 23-2577 Henry Beverly v. Abbott Laboratories et al. Ms. Major will begin with you. Good morning, may it please the court. My name is Ruth Major and I represent, I'm here on behalf of Henry Beverly and this appeal addresses essentially three claims that Mr. Abbott claims. One is Mr. Beverly's discrimination claim and he brought those, what we're actually seeking review of is his claims under the Illinois Human Rights Act in Section 1981. There's three components to that claim. One was that he had 95% of his work responsibilities removed from him during the 2014-2015 time period. He'd been employed by Abbott for approximately 8 years at that time, excellent performance reviews throughout. And his work was reassigned by his manager to herself, she's Asian, Mr. Beverly's African American, and was assigned to a new hire who was also Asian, Mr. Akhtar, and that was in 2014-2015 time period. The discrimination and retaliation claims under the state statute in Section 1981 had a discrimination component based on the removal of Mr. Beverly's work, which the district court agreed was a material adverse action. So she allowed that claim to go to trial. She denied Mr. Beverly's claim based on constructive discharge, based on the same circumstances, his removal of his work and his leaving to go on a personal leave of absence at that time. And then also when he was actually terminated by Abbott, she denied that that was a discriminatory termination, finding there was no pretext, even though Ms. Liu had told Mr. Beverly everything was fine, he didn't need to return to work, and then told her managers, her bosses, that she needed someone and she had to hire somebody, and eventually hired another Asian employee, so her team was all Asian. In this case, in her deposition, Ms. Liu denied that she knew the replacement for Mr. Beverly until she was interviewing him in 2015, summer of 2015. She did admit at trial she'd actually known him for years. And we actually have an email from discovery that shows that before Mr. Beverly went on his leave of absence, Ms. Liu was actually copying Mr. Tsai on work emails about projects Mr. Beverly would have been working on while he was still employed at, Mr. Tsai was still employed at AbbVie. So she was essentially preparing Mr. Beverly's replacement before Mr. Beverly even went and requested a leave of absence. And at trial, when that email was presented to her, she first said it must have been falsified, and we said Abbott produced it. And then she said after a break, well, maybe the email system just populated his email address in there. So Ms. Liu lied repeatedly about this replacement, who was Asian, for Mr. Beverly. We're asking the court to reverse the summary judgment on the constructive discharge claim, because under federal law, this circuit has found that forced idleness where it's intolerable is sufficient for a constructive discharge case to go to a jury. And in this case, 95% of his work had been removed from him for almost a year. Does the record indicate any reason for that reallocation of work? They deny that it happened, so it's a fact dispute. Whenever Mr. Beverly would go to Ms. Liu and say, I don't understand, I don't have any work, why can't I work on my projects, why are you having Mr. Akhtar, why are you doing it? She would say, oh, you've got plenty to do, don't worry, you're fine, essentially gaslighting him because he was sitting at his desk with nothing to do. He would only do a PowerPoint that took very little time, and then he would get some ad hoc projects from people. And he had an exemplary career there. So she found it was an adverse material action to go to trial, but denied that it met the standard for constructive discharge, even though this court has recognized that taking away somebody's work, so they have forced idleness, it can be intolerable, which it was for Mr. Beverly, and should go to a jury. The other issue with regard to this, the constructive discharge, or the discrimination claim, as it concerns summary judgment, is that we also argue that the termination itself, because Ms. Liu lied to Mr. Beverly and said everything's fine, while literally at the exact same time sending out communications to her manager saying, we need to replace Mr. Beverly because I need somebody. And because of her lies and making Mr. Beverly believe that he didn't need to come back, her claim that she had to replace him was false. It was simply false. He would have come back at that time. During that period of time, he was working for the counties? He did. So when he went on the leave of absence, it's a personal leave of absence, and the policy does specifically allow that you can work during that time. Can't you reconcile her two actions, though? She yelled and she was telling him, we don't need people now, we don't need you back now, especially, I gather, he wanted to come back on a part-time basis. She wasn't really interested in that arrangement. Well, he would have come back full-time. I mean, he would have come back full-time at any point if they... Did he articulate that to her? Yes. He said, do you want me to come back? She didn't know he had a job. I mean, she just knew he was on a leave of absence. I see. So he said, do you want me to come back? He would literally come into the office and meet with her and say, do you want me to come back? Can I come back? Everything's fine. Literally within the same day, she's telling him everything's fine. She's telling her manager she needs to replace him. Is it possible to characterize her search for someone new because she knew this new She was going to need a full-time person to handle that. She was beginning to have suspicions about whether he really was going to be available. No, I believe the bottom line is she was lying to him about not needing him there while looking for someone, telling her manager she needed to replace him because she did need him. She told him, we don't need you. She told her managers, we need someone in that spot. Was she ever given a chance to really explain herself? I don't. I mean, we deposed her for an entire day, but I don't believe she ever gave any explanation that we believe because she could have told Mr. Beverly at any time, we do need you. I mean, I need somebody here. This is causing a burden on us, if that was the truth. She didn't tell him that. And then she said a complete opposite thing to her managers and replaced him and then lied about the replacement, said she only met him when she was interviewing him and then at trial admitted she'd known him for years. She's been at social events with him. It was a complete lie about Mr. Sy. She did know him. So Ms. Bajor, on the defamation claim, just a second. It came down in a somewhat of an awkward sequence. It was, as I understand, it was not the subject of summary judgment. It was the subject of an eliminate motion. You were there. On Monday, the first day of trial, that defamation claim is still alive. And then is it the second day of trial that DE 235 comes down in which the court enters judgment on the defamation claim? Well, yes. So just the defamation was addressed in the first motion for summary judgment, the one that was filed in accordance with the court's scheduling order four years earlier. They did move for summary judgment on some arguments. It was denied. The day before trial, they filed a motion citing no federal rule. It was just a motion. And it was a summary judgment motion. And they admitted repeatedly they should have filed it on this issue four years earlier. And then we were required, and obviously I'm a small firm. I don't have teams of people. We had to brief it that night on the first night of trial and get a brief in for the next day because the judge was saying, I'm ready. I'm working on it. You need to do it as soon as you can. And it was very, so we got it in. And then she dismissed the claim midway through Mr. Beverly putting his case on. And it didn't fit. There's no discretion to ignore her own scheduling order unless there was excusable neglect. And there wasn't. Their answer was, yeah, I guess we should have done this. And we didn't. Apparently they'd been talking about it for even a year before and still never did it even then. And they waited until, and I think that was a tactic, wait until the day before and put us in a bad position because, and it should have been four years ago. And under Bowman, which is a recent decision from the Seventh Circuit, they had no basis to do that. I gather, though, if the district judge was right on the law on that defamation claim, it still would have been subject to a Rule 50 motion. It would have been, it could have been subject after we rested and it would have given us, you know, obviously the rest of the trial. And then we would have, you know, would have maybe made more sense to a jury. They would have at least heard the evidence. Well, that gets to one of my other questions. Was there, what was said to the jury, if anything, by the judge or by counsel, about the change in the evidence that you said you were going to be presenting on the defamation claim and its disappearance? Just the case, the claim was dismissed. And Ms. Liu's dismissed from the case. And that's what the judge told the jury? Yes. Okay. And on the substantive issues of the defamation, we address Milkovich extensively in our briefs. Milkovich is controlling authority. It's the U.S. Supreme Court. Milkovich, you know, discusses sort of the path that leads to Milkovich. U.S. Times v. Sullivan is the case where the U.S. Supreme Court said that state defamation claims have limitations based on the First Amendment. And in New York Times v. Sullivan, the U.S. Supreme Court recognized a limitation on state tort claims if the plaintiff was a public official. Subsequently, in Curtis Publishing, the U.S. Supreme Court expanded that a little to include public figures. Milkovich essentially takes that analysis and sort of discusses how that limitation is applied. And the standard in Milkovich is very clear. If the statement is provable as false, then it is, it can be the subject of a defamation claim. Okay. And... Could... Okay.  Thank you. Could I back you up to the lead issue? Sure. Tell me, how much work was Mr. Beverly doing for the county while he was on leave from Abbott? Well, his testimony, he was basically sort of training in that position. And he would probably work about 25 hours a week because he was, the person who was doing the job would train him, but then he had to do the job. So he would, you know, Cook County's a little more lax, he would come in about 25 hours a week, get trained, and then his trainer would say, okay, I've got to do my work now. So, you know, goodbye. And he would leave. So I would... Was he training for full-time work? To eventually, yeah. Eventually work full-time. Yeah. Thank you. Would you like to reserve the remainder of your time? Okay. Yes. Thank you, Ms. Major. We'll now move to argument from the apple leaf from Ms. Chandra Sikaran. Good morning. Excuse me. Good morning, Your Honors. Good morning. May it please the Court. My name is Uma Chandra Sikaran. I represent Appellee's Abbott Laboratories in Victoria Loo. All of Henry Beverly's arguments today and in briefing amount to a request for this Court to disregard the extensive record and to second-guess the decisions of the District Court Judge. This Court should deny that request. First, as to the defamation claim, the District Court correctly determined that under Illinois law, Ms. Loo's statement to Abbott's Global Security Department that Mr. Beverly had a history of lying was a protected opinion under the First Amendment. Second, Mr. Beverly hasn't identified any basis to overturn the District Court's summary judgment decision dismissing his discriminatory termination and constructive discharge claims. His claims are especially lacking when you consider the full record here, which is that Mr. Beverly obtained a full-time job from Cook County that's confirmed by an offer letter that they sent him that's part of the record, that he then requested a leave of absence from Abbott, an unprotected leave, personal leave, and then he withheld that information from Abbott because under the policy he would have lost his employment automatically because under the policy, if you obtain employment elsewhere, your leave and employment are automatically terminated. It's with this lens that the Court should look and analyze these claims. And then finally, Mr. Beverly can't show that there were any trial errors that would warrant overturning the jury's verdict. The trial judge should be given deference here because it presided over the trial over multiple days. It listened to the witnesses and the evidence, and the evidence here was overwhelming. The jury came back with the verdict for Abbott in less than two and a half hours. I want to start with the defamation claim. This was properly dismissed as a question of law. It was appropriate for the judge to decide it during trial. There was no surprise to Mr. Beverly. This was an issue in affirmative defense that Abbott had asserted in its answer. It had brought it up in pretrial filings, and it was discussed specifically with the judge at the final pretrial conference where the judge specifically said that she would rule before the case was submitted to the jury. Abbott didn't submit a summary judgment brief. It submitted a bench brief advising the Court on the law, and the Court decided to rule appropriately. The district court asked Mr. Beverly to submit a written response, and the timing on that is really no different than the timing would have been had Abbott moved for judgment as a matter of law at the close of the plaintiff's case. They also would have only had a short amount of time to prepare a written submission in that instance as well. So no prejudice or surprise to Mr. Beverly on that regard. It seems kind of unusual, though, to do that in the midst of the plaintiff's case where we have opening statements that promise certain evidence that's not going to be allowed in the end. I don't think I've ever seen that before. And the judge actually protected Mr. Beverly from some prejudice, as she noted in her opinion. Had all of the evidence around defamation been allowed to come in and then it not go to the jury, Abbott would have had much more leeway in getting into his character and his history of lying. A lot of that evidence, most of that evidence was shut down because the claim was dismissed during trial. So it actually, the prejudice would have flown to Mr. Beverly had the Court held on ruling after the plaintiff's case. You don't think there was prejudice from them promising evidence in opening statement that they weren't allowed to present? No, Your Honor. There wasn't prejudice there. And in fact- Why not? That seems pretty startling to me. Had the evidence been presented and it had not gone to the jury, the jury would have been instructed in the same regard that they wouldn't have that claim to decide. So there wasn't any prejudice in that regard. So moving on to the merits of the claim. Illinois law is what guides the defamation claim here. And consistent with U.S. Supreme Court precedent, the Illinois Supreme Court has held that a statement is constitutionally protected if it doesn't state actual facts. It can't be interpreted as stating actual facts. And the Illinois Supreme Court has also set forth factors to look at to determine whether that's the case. So when we review that question, what's our standard of review? It's whether the statement was protected opinion. So in this case, you would review it de novo because the judge decided it as a question of law. And so this court should look to Illinois law. And the Illinois Supreme Court has spoken as to what factors it should look at to determine whether speech is an opinion or defamatory. And there are three factors that the Illinois Supreme Court in SELEA and in Imperial Apparel have set forth. One is whether the statement is precise and readily understood meaning, whether the statement is verifiable, and whether the statement's literary or social context signals that it has factual content. If you apply the factors here as the district court did, Ms. Liu's statement is non-actionable opinion. First, it's not verifiable. There's nothing in the global security report or there's nothing that global security or anyone else could have done to verify the truth or falsity of what Ms. Liu said. There are no facts as to who he lied to, when he lied to, in what context he lied. And even when you consider the statement in the context of employment, it still doesn't provide any factual content. Again, you'd have to, did he lie to Ms. Liu? Did he lie to a coworker? Did he lie to a client? When did he lie? It doesn't provide any kind of factual context. And you would have to do an endless analysis of every work interaction or every assignment. The social context of the statement also doesn't provide any factual content. Ms. Liu contacted Abbott's global security department because she was afraid. After terminating Mr. Beverly's employment, she didn't know whether he had turned in his badge or his laptop. And so that context doesn't provide any additional factual context for him having a history of lying. And there is, I think, a public policy interest in that employees reaching out to their company's security should and do often make opinions in that context. And if you look at the literary context as well, the global security report itself, which is where the statement is documented, there's no additional context as to what the factual basis is for this statement. It's just a standalone statement. Mr. Beverly has a history of lying. And the Illinois courts have found that a general statement that someone is a liar without further factual content is not actionable. When she made that statement, she knew that he had another job while he was still playing her along with respect to the extension of his leave? She did not know at that time. When did she learn about the other job? We learned about it in this litigation. She never knew about it all through this period? No, because Mr. Beverly did not share that fact with Abbott because he would have been automatically terminated. So that's not the basis for her statement that he was a liar? Correct. But if the statement had said something like that, that he lied about whether he had another job, that could be proven true or false. But right now we just have he has a history of lying, which isn't top-cut capable of really being verified. I hope at some time in your argument you'll talk about your opponent's argument on constructive discharge. Yes, and I'll go to that next, Your Honor. So the district court correctly decided that there was no evidence of constructive discharge here. As Ms. Major noted, Mr. Beverly has already had a trial on the reduction of his duties, and the jury rejected those claims. Now he's claiming a second bite at the apple and claiming that those reduction in duties amounted to a constructive discharge. But he has to show that the working conditions were so intolerable that he had no choice but to resign. So the trial was focused on whether his duties were reduced? That's correct, Your Honor. It's an independent delegation. Whether or not that should have gone to the jury is another issue. But it did go to the jury. The jury apparently decided against him. That's your point? Correct. That's right. And so now he's on the same facts, Mr. Beverly is alleging, that the court should find that they rise to a level of a constructive discharge. We have cases that talk about the proverbial broom closet, putting the person whose office becomes the broom closet and he's given nothing to do. How do you distinguish him? Well, so that didn't happen here. So Mr. Beverly continued to work out of the same office. He had the same position. He wasn't transferred to a different role. He continued to work with the same co-workers, same clients. So nothing changed other than their allegation that summary judgment that had to be credited, that his duties had been reduced. He was marginalized. That's their allegation. But again, the reduction in duties, he's already had a chance to have a jury hear that. It sounds like what you're saying is that the district judge may have been premature in granting summary judgment on that claim, but that in light of the jury's verdict at trial, that error would have been harmless. That's correct, Your Honor. That's correct. And also, I mean, you know, the standard is working conditions so intolerable that he had no choice but to resign. Mr. Beverly didn't resign. I mean, that should end the analysis itself. He hedged his bets, though, didn't he? I mean, he went and got another job in case the writing was on the wall. Right. And he not just got another job, but he asked for a personal leave of absence so that he could continue to get credit towards his pension and then didn't tell Abedino the policy explicitly says, if you get another job, your leave and your employment are automatically terminated. Something wasn't clear, at least to me, from the courts, and that is whether your client ever suggested in deposition or at trial that the change in this gentleman's duties had something to do with the introduction of this new system and reallocation of response, of a reorganization within the office because of that. Was that argument ever made? Did any of your witnesses ever make that argument? Yes, Your Honor. So there was substantial evidence at trial. Tell me a little about it. Tell me a little about that. So there was a major system change that was happening in August of 2015, and that meant that it changed the formatting of the reports and a lot of the work that Mr. Beverly was doing. And that change wasn't just starting in 2015. There were things they were doing before that leading up to that change. And then in addition to that, just the reports themselves changed over time. So he says that he didn't do certain reports like the Pulse report. Well, that changed over time. So it's true that he didn't do that, but he did other reports instead. What among your witnesses, whose testimony do you think is key on that point? So you have the testimony of Victoria Liu, his manager, and then you have the testimony of Hamed Akhtar, who is his coworker, who is the person who had IT aspects of the job and who Mr. Beverly alleges took some of his responsibilities, although Mr. Akhtar denies that because he didn't have the sort of financial background. Mr. Akhtar said what? Akhtar denies that because he didn't have the same sort of financial background that Mr. Beverly did to be able to do those tasks. He only had an IT background. I see. Is it correct that your client outsources the leave process? It's correct. So they use a third-party matrix to administer the leave. And at trial, there was very compelling evidence that was presented. There's an audio recording of Mr. Beverly when he's requesting his personal leave of absence where the matrix representative asks him whether he has another job, and he denies it. So he was untruthful in that regard there. Could you address in a little more detail than you did in your brief the Bowman case and the decision to indulge this last-minute motion? So the Bowman case addresses a late filing of a summary judgment motion. This sure looks a lot like that, though. But it wasn't. We didn't move for any specific relief. We provided authority to allow the court to decide this issue. We previewed to the judge at the final pretrial conference that this was an issue that we were pursuing and that we wanted the court to rule on it before it went to the jury. She agreed to do that. The briefing would have been identical if we had moved for judgment as a matter of law at the close of plaintiff's case. So we didn't file a summary judgment motion. We just provided the judge in advance before moving for judgment as a matter of law on the legal authorities that she should consider on this issue. Are there further questions? Thank you very much. Thank you. Ms. Major, we'll move to rebuttal. Ms. Major, if you could begin with your colleague's point concerning a reduction in prejudice because of the timing of the dismissal of the defamation claim. That it wasn't prejudicial for it to happen at that time during trial? You're correct to ask for a refinement, that there was less prejudicial evidence that came in as a result of the defamation claim being dismissed on the second day of trial rather than later, say, by a Rule 50 motion. Well, I think that, as Judge Hamilton pointed out, we said we were going to provide evidence to the jury in our opening statement and then we never did. And I think most people understand that doesn't make you look very credible to the jury and they wonder what happened and they think something's awry as opposed to hearing the evidence and understanding there was a basis for what we said in our opening statement. We had two or three more days before we would have finished our case and we would have prepared during that time for any sort of unanticipated motion. We had one night to prepare this on top of the other things that we have to do to prepare. The judge herself said the timing of the motion is the definition of insanity and the defendants admitted it should have been brought with the summary judgment four years earlier, but nevertheless it went forward. I don't know if that answers the questions that you had. With regard to defamation, I just want to be clear, Illinois follows Milkovich. Milkovich requires first that there be either a public plaintiff for the limitation to apply. And I said that's either a public official or a public figure or a media defendant. It never even should have been applied in this case. And in terms of whether this is not an opinion, Milkovich used the exact example to explain to the courts if someone is said someone's a liar, that is a statement that should not be dismissed. It's not going to fall into that category of not provable. And this court agreed in the Sullivan case where it said that if you say a lawyer is dishonest, that is a claim that can go forward on defamation, as opposed to like the Frieden case where there were these sort of ambiguous over broad type statements. Counsel said going to the termination issue, the termination of the employment, counsel said that under the leave policy if you had any employment, you could get terminated. That's not accurate. At the very end of the policy, not under the requirements section, at the very end of this policy, there's a statement that says if you are employed, something to the effect of employed full-time. It has to be full-time employment. You can have a job. You can work 25 hours a week. There's no prohibition on that. And Beverly doesn't, it's not like the unemployment, the Illinois Department of Employment Security where they ask you for certifications. Beverly, Abbott never even follows up. Are you employed now? Are you working? There's nothing on it. And at the time of the call with the third-party administrator, Mr. Beverly was still working for Abbott. He had not started this job. Thank you, Ms. Major. Okay, thank you. I appreciate it. Thank you very much, Ms. Major, and thank you, Ms. Chandra Sikaran. Both parties' arguments with regard to trial error are also preserved. It will take all of this under advisement. Thank you. Thank you.